**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **CHRISTINA NIELSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | **1:23-CV-02353-MLB-RDC** |
| | ) | |
| **CROSSCOUNTRY MORTGAGE, LLC, and STEVEN BOCCA,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | | |

**CROSSCOUNTRY MORTGAGE, LLC'S
MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Christina Nielsen alleges that she knew about, witnessed, and personally experienced alleged sexual harassment from Defendant Steven Bocca *for nearly four years* while working for Defendant CrossCountry Mortgage, LLC. She never told him to stop or reported him though, purportedly because she was too afraid. However, the record shows that Nielsen was close friends with Bocca and regularly socialized with him. She liked being part of Bocca's "cool crowd" because it led to her having "an easier day" and made her "life easier." As part of the branch's management team, Nielsen was part of the very office culture she now claims was actionably hostile.

In 2022, Nielsen resigned out of nowhere and for the first time made a vague

allegation of sexual harassment involving Bocca. CrossCountry immediately began to investigate, but Nielsen flat out refused to participate. Instead, she filed this lawsuit, raising *for the first-time* instances of allegedly unlawful conduct, including instances of alleged assault and battery. Although Nielsen will attempt to withstand summary judgment by criticizing CrossCountry and the very process she had a direct hand in thwarting, it is appropriate here.

On her claim for Title VII sexual harassment, Nielsen cannot establish (1) that she suffered a materially adverse employment action, (2) that the alleged harassment was either unwelcome, or severe and pervasive enough to alter the terms and conditions of her employment, or (3) that a basis exists for CrossCountry to be held liable here. With respect to her claim for Title VII retaliation, CrossCountry had a legitimate and non-discriminatory reason to accept Nielsen's resignation, and there is no evidence of pretext. Nielsen also cannot prevail against CrossCountry on her state-law tort claims and her voluntary underemployment defeats her claims for backpay and front pay.

## II. STATEMENT OF RELEVANT FACTS

### A. Nielsen's Employment at CrossCountry's Alpharetta Branch

CrossCountry is a retail mortgage lender headquartered in Cleveland, Ohio, which has 1,259 branches throughout the fifty states, D.C., and Puerto Rico, and

over 7,000 active employees. (Novak Decl. ¶ 1 ).[1] Nielsen began working for CrossCountry as a Loan Processor in July of 2018 at its Alpharetta, Georgia Branch. (Pl. Dep. 22:15-19; 109:1-6)).[2] Her responsibilities changed over the years with title changes and pay increases. (Id. 35:5-8; 38:21-39:21). She was part of the branch's "management team" for over a year and a half. (Id. 149:12-150:10). Nielsen reported to Bocca (the Originating Branch Manager) and Faith Helm (the Non-Originating Branch Manager). (Id. 43:3-44-25). At one point, she reported to another manager who eventually left the company. (Id).

CrossCountry has an Unlawful and Sexual Harassment Policy. (Novak Decl. ¶ 4, Ex. 1, pp. 2-3). The Policy's first step is a recommendation that the affected employee ask the alleged harasser to stop. (Id.). If the harassment continues, or if the affected employee does not feel comfortable confronting the harasser directly, they are directed to (1) "report [the harassment] immediately to [their] Manager, the Senior Vice President of Human Resources, and/or the Legal Department." (Id.). Employees are informed that they may also direct complaints to the EEOC or any of the various state agencies. (Id.). Employees who witnessed or experience any form

---

[1] The declaration of Michelle Novak is attached hereto as Exhibit A.

[2] The non-confidential portion of the deposition of Plaintiff Christina Nielsen was filed with this Court. Pertinent excerpts of Plaintiff's deposition and any deposition exhibits are attached hereto as Exhibit B.

of harassment or inappropriate conduct covered by the Policy are told they must immediately report the situation, and all managers must report any complaints of misconduct. (Id.). Per the policy, CrossCountry will "promptly investigate complaints of harassment." (Id.) Part of the investigation process is a meeting "*with the complainant* to gather more information about the nature of the issue." (Id.)(emphasis added). This enables the company to investigate complaints "fair[ly], timely, and thorough[ly.]" (See id.). CrossCountry has an anti-retaliation policy as well.

CrossCountry sent Nielsen a copy of its employee handbook and sexual harassment policy as part of the onboarding process (Novak Decl. ¶ 6). Nielsen acknowledged receipt of the handbook and CrossCountry's sexual harassment policy. (Novak Decl. ¶¶ 7-8 and Ex. 3).

**B. The Culture at the Alpharetta Branch**

The culture at the Alpharetta branch was like a "very big family." (Pl. Dep. 257:8-11; Vidic Dep. 25:18-21; Matlin Dep. 108:6-9; 111:8-13).[3] With that closeness came a "lax environment" where "four-letter words" were used "like commas," and occasional jokes about sex would occur. (Pl. Dep. 239:6-10; 348:9-

[3] The depositions of John Michael Vidic and Michael Matlin were filed with the Court. Pertinent excerpts of those depositions are attached hereto as Exhibits C andD, respectively.

19; Vidic Dep. 24:12-14, 25:6-7: Helm Dep. at 126:2-24, 136:10-17, 240:2-12, Matlin Dep. at 32:5-19; Haddad Dep. at 27:14-20; 28:23-29:8).[4] It was a "work hard, play hard" culture due to the high-pressure and high-stress nature of the mortgage industry. (Helm Dep. 239:6-240:19).

Nielsen was close with others in the office, including Bocca, Helm, and co-workers John Michael Vidic, John Ellis Haddad, and Michael Matlin. (Pl. Dep. 227:8-228:6; 125:16-18). She socialized with all of them outside of working hours, which included such things as dinners out, "Fun Fridays" at Helm's house, and various birthday and holiday parties. (Helm Dep. 140:1-9; 141:8-13, 242:14-17; Vidic Dep. 31:25-12, 30:25-31:5). Nielsen had a role in the office dynamic. She too would swear, engage with dating apps, talk with co-workers about what it meant to be "thirsty," and talk about her own sex life with her co-workers. (Pl. Dep. 239:5-9, 246:18-247:1, 250:17-21,333:5-24, 348:9-19).

Nielsen's close relationship with Bocca specifically is evidenced through her years' long string of text messages with Helms, where she is seen saying "hey" to Bocca and referring to him (and Helms) as "not only [her] bosses but two humans I love so much" after they helped her get a mortgage on her house around June of

---

[4] The deposition of Faith Helm and John Ellis Haddad were filed with this Court. Pertinent excerpts of Helm's deposition are attached hereto as Exhibit E and F, respectively.

2021. (Plf. Dep. 229:15-230:7, 254:18-255:19, 257:5-7 and Ex. 15, pp. BOC341, BOC394).[5] Nielsen conceded referring to Bocca as the "boss I know and love" and was sure she had told Bocca she loved him, hugged him over the years, and that not all of the physical conduct from him was unwelcome or unwanted.[6] (Id. 233:6-12; 338:23-339:8; 340:4-9; 378:18-25).

Nielsen liked her good relationship with Bocca and being in the "cool crowd." (Pl. Dep. 260:14-261:3). Being in the "cool crowd," made her life and job easy and she "actually enjoyed, like, having you know, an easier day by getting along with the bosses." (Id.). In 2019, she contemplated leaving CrossCountry but was given a pay increase and decided to stay. (Id. at 40:15-22). Nielsen was a "magnificent employee," and had no performance issues. (Pl. Dep. 114:23-25; Scherma Dep. 221:4-17).[7]

## C. The Alleged Sexual Harassment

---

[5] For purposes of judicial economy and because most are not relevant to this motion, CrossCountry is not attaching the several hundred pages of text messages between Nielsen and Helm. Pages 341 and 394 of the texts between Nielsen and Helm is attached hereto as Exhibit G.

[6] The record establishes that Bocca was friendly and actually hugged everyone – men and women. (Helm Dep. 248:6-19; Vidic Dep. 24:15-16; Haddad Dep. 102:9-12; Matlin Dep. 111:6-13).

[7] The deposition of Brittney Scherma was filed with this Court. Pertinent excerpts of her deposition are attached hereto as Exhibit H.

Nielsen alleges that there was never a period during her employment with CrossCountry from October of 2018 until her last day that she was not sexually harassed for any great length of time. (Pl. Dep. 77:22-78:5, 79:6-10). She claims one of the first times was in the office Bocca said, "You're so f**king hot." (Id. 78:9-16, 121:11-17). From 2020 on, Nielsen claims that Bocca would walk by her desk and whisper in her ear "I want to f**k you and you're so hot, almost every day." (Id. 121:8-124:16). On two separate occasions, Bocca allegedly tried to put Nielsen's hand on his penis, over his pants. The first time was at a restaurant in December of 2020. (Id. 124:16-24). The other time was allegedly at work sometime in 2022. (Id. 126:4-127:20). Nielsen also recalled an instance where Bocca came into the office, and she was sitting in a chair, and he pushed her head down to the height of his penis and said, "you're sitting perfect height." (Id. 149:3-6). In April of 2022, Nielsen went to Helms's house to celebrate Helms's birthday. (Id. 157:20-5). Nielsen admitted the event was an "off-site, off-work party," which she voluntarily attended on a Saturday. (Id. 161:10-2). According to Nielsen, Bocca called her inside and said, "Come over here and make out with me." (Id. 158:21-25). Nielsen said, "Absolutely not." (Id.). Bocca then allegedly touched her and rubbed her butt. (Id. 159:14-160:5).

Nielsen never reported this incident to anyone at CrossCountry. (Id. 161:5-9). She also never told Bocca to stop the conduct she found harassing, and claims she

told him more than one time ***that she was not afraid of him*** but was trying to protect him.[8] (Id. 134:21-135:4). When Nielsen finally raised concerns, others in the office were shocked because they had never seen or heard anything to indicate she felt this way. (Vidic Dep. 81:7-82:3; Haddad Dep. 67:23-8).

**D. Nielsen's Resignation and Complaint of Sexual Harassment**

On May 18, 2022, Nielsen came into the office and forwarded numerous documents to her personal Gmail account from her CrossCountry work email. (Pl. Dep. 182:4-17). She then asked to meet with co-workers, Haddad, Matlin, and Vidic and told them she was resigning. (Pl. Dep. 174:4-20, 176:16-179:10; Matlin Dep. 93:11-17; 106:9-23; Haddad Dep. 105:11-16; Vidic Dep. 47:5-14; Scherma Dep. 71:15-24, 76:15-23, 109:21-24, 120:18-122:1; 124:18-22; 125:15-126:4, 126:9-25; Novak Dep. 69:13-70:1; 195:9-14).[9] For the first time, Nielsen told her co-workers about instances that had allegedly occurred with Bocca. (Pl. Dep. 175:21-176:10; Vidic Dep. 81:11-82:15; Matlin Dep. 77:24-78:17; Haddad Dep. 67:23-68:8).

---

[8] Nielsen also claimed she *was* afraid of Bocca and never reported him because another employee *jokingly* told her not to go to HR because Bocca was close with HR.(Id. at 125:6-18; 128:19-129:3; 132:14-133:14; 136:22-137:5, 155:10--157:1). According to Nielsen, it was "definitely a joke" though. (Id. at 136:22-137:20).

[9] The depositions of Michelle Novak was filed with this Court. Pertinent excerpts of her deposition are attached hereto as Exhibit I.

Matlin called the HR Department. (Matlin Dep. 87:10-88:14). Michelle Novak, the Senior Vice President of HR, who works in the company's Ohio headquarters, picked up immediately. (Matlin 88:12-14). Brittney Scherma, the Human Resources Manager, was also there on speaker. (Novak Dep. 205:5-8; Scherma Dep. 122:17-23). Nielsen got on the phone and told Novak that she was "resigning effectively immediately, that she did not feel comfortable coming forward [and] stating why but alluded to women [not being] protected in the office." (Scherma Dep. 120:10-123:2; 125:15-128:4; Novak Dep. 198:4-199:23; 213:18-23).

Novak told Nielsen she would start an investigation. (Novak Dep. 213:1-214:11). Novak also told Nielsen that she could reconsider her resignation and they would look to see if there were any remote positions available. (Scherma Dep. 127:7-12; Novak Dep. 216:15-20). Novak told Nielsen she would continue to be paid and Novak would follow up with her in a few days. (Id.). At the end of the call, Nielsen expressed her gratitude for the support. (Scherma Dep. 121:20-122:4). Later that night, Nielsen sent a text to Haddad, Matlin, and Vidic stating that her "reason for quitting was not 'that.'"[10] (Pl. Dep. 174:4-20 and Exhibit 10). Nielsen stated she was "blown away and satisfied with the outcome of the discussion…." (Id.).

---

[10] While Nielsen curiously claims to not know what she meant by "that," her own contemporaneous text message confirm that she did resign on that call. (Pl. Dep. 177:24-178:6).

**D. Nielsen Refuses to Cooperate with CrossCountry**

Two days later Nielsen sent Novak an email stating she had retained counsel since it was "clear" that Novak did not plan to investigate and that she decided to file an EEOC charge. (Pl. Dep. 190:25-191:18 and Ex. 13, Bates No. CCM-Niel000228, *see also* Pl. Dep. 193:12-194:6). She said she was "happy to continue her job, but [would] not come back into the office of work with Steve Bocca or Faith (his lover)." (Id.; see also Pl. Dep. 178:25-179:6). There was back and forth between Nielsen and Novak regarding the investigation over the next few days, during which Nielsen repudiated and attempted to rescind her resignation. (Id. at Ex. 13, Bates Nos. CCM-Niel000226-CCMNiel000227).

When Scherma asked Nielsen if they could call her to talk to her about her allegations, Nielsen responded, "I am not comfortable talking on the phone with you at this point." (Id. at Ex. 13, Bates No. CCM-Niel000226). A couple of days later, Nielsen reiterated, "I'm happy to meet with you and the EEOC investigator or answer any written questions you have for me about Steve and Faith, but I don't feel comfortable meeting with you alone.[11] (Id. at Ex. 13, Bates No. CCM-Niel000224).

[11] During her deposition, Nielsen conceded that she raised numerous allegations in this lawsuit that she never told CrossCountry's HR department and she admitted there was no way CrossCountry's HR department would have known about the things she alleges Bocca did to her. (Pl. Dep. 211:12-212:11; 213:10-23).

Irrespective of Nielsen's refusal to cooperate, CrossCountry began an investigation. It conducted interviews of nine people, including Bocca, Helm, Haddad, Vidic, and Matlin and four others. (Scherma Dep. 111:23-112:2; 115:7-116:13; Novak Dep. 10:23-11:3; Helm Dep. 161:17-24; Haddad Dep. 55:15-21; 76:4-9; Vidic Dep. 60:12-23; Matlin Dep. 102:25-103:22). CrossCountry did look into the possibility of a remote position for Nielsen, but there were none. (Scherma Dep. 132:18-22; 150:10-20; 176:10-14; Novak Dep. 236:23-237:9; 296:21- 298:24). It continued to pay Nielsen and provide her benefits. (Id.).

After approximately five weeks, Scherma reached out *again* to see if Nielsen would talk. (Pl. Dep. 266:12-24 and Ex. 16). Nielsen responded, "I have an Attorney, did you need me to re-send his information?" (Id.). At that point, and after attempts by CrossCountry's to reach Nielsen's attorney, the company accepted her resignation. (Novak Dep. 294:15-25 and Ex. 19; Novak Decl. ¶ 9 and Ex. 4). Nielsen employment ended as a voluntary termination with eligibility for rehire, and she was paid from May 18, 2022, through July 1, 2022. (Scherma Dep. 127:7-1; Novak Decl. ¶¶ 10 and Ex. 5).

**E. Nielsen's Belief that the Policy Did Not Apply to Her**

Despite receiving and acknowledging the Policy, Nielsen neither followed it nor believe it applied to her. (Pl. Dep. 65:12-66:12). She did not report any of the alleged sexual harassment she claims to have experience for nearly four years, nor did she report any of the sexual harassment she allegedly witnessed or knew about, even during the time she was on the branch's management team. (Pl. Dep. 148:5-149:13, 150:18-151:5; 154:20-155:18). She also refused to meet with the HR Department even though the Policy contemplates a meeting between HR and a complainant.[12] (See, Pl. Ex. 13 and Ex. 16).

## F. Nielsen Voluntarily Left the Mortgage Industry.

Nielsen worked in the mortgage industry for twenty-one years. (Pl. Dep. 17:16-22:20). She waited a couple months before she "started to put the word out there" that she needed a job. (Id. 23:17-24:13). She "didn't want to be in the

[12] Nielsen claims she did not have to report Bocca's alleged harassment or cooperate because she believes CrossCountry had knowledge of Bocca's harassment of women and did nothing. Most of what Nielsen raises in this lawsuit amounts to hearsay, speculation, and misinformation. CrossCountry received one EEOC charge from a woman named Lisa Benjamin who filed after she was laid off in 2019. (Novak Dep. 220:9-226:7 and Ex. 10). The EEOC was unable to conclude there was a violation. (Keller Decl. at ¶ 3 and Ex. A). The second women, Aydee Short, left CrossCountry in 2018. (Keller Decl. at ¶ 4 and Ex. B). CrossCountry filed a lawsuit to reclaim the sign-on bonus and Short counterclaimed for discrimination. (Keller Decl. ¶¶ 5-6 and Ex. C and Ex. D). Both matters were handled by counsel. (Scherma Dep. 86:16-24, 209:8-19; Novak Dep. 175:13-17, 289:1-5). The declaration of Kerri L. Keller is attached hereto as Exhibit J.

mortgage industry any more…" so she became a caregiver and works part-time. (Id. 22:20-23:14). She receives no benefits at her job, but she loves it. (Id. 23:15-16; 309:25-310:10). She did not look for any other full-time equivalent job with benefits. (Id. 25:3-24). She did not go on any other interviews or enlist a recruiter. (Id.).

## III. LAW AND ANALYSIS

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In order to defeat a motion for summary judgment, the non-moving party cannot rely on his own speculation or conclusions and must present specific facts to support each element of his case. Matsushita Elec. v. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Not a "disfavored procedural shortcut," summary judgment is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

### A. CrossCountry is Entitled to Summary Judgment on Plaintiff's Title VII Sexual Harassment Claim.

To prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that it was sufficiently severe or pervasive to alter the terms and conditions of employment and create a

discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. E.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999); Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004).

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68, 106 S.Ct. 2399, 2406 (1986). Thus, "the correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained of behavior was] unwelcome." Id. "In determining whether a plaintiff, by her conduct, indicated that the behavior was unwelcome, the court may consider whether, as well as the manner, in which the plaintiff registered her complaint." Coyle v. Dakko Prop. Mgmt., No. CV-07-RR-0058-S, 2009 U.S. Dist. LEXIS 148269 at *45 (N.D. Ala. Sep. 30, 2009) (Where the employee did not complain or object to the conduct at the time, the court concluded that the conduct was not unwelcomed).

For a sexual harassment claim to be actionable under Title VII, the harassment must also be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor, 477 U.S. at 67. This requires a plaintiff to show that the harassment was both subjectively and objectively hostile or abusive. Harris v. Forklift Systems Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367 (1993). "Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and

harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." Johnson v. Booker T. Washington Broad Serv.., 234 F.3d 501, 509 (11th Cir. 2000).

In assessing whether sexual harassment is sufficiently severe or pervasive enough to create an abusive working environment, courts will consider (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or a "mere offensive uttering"; (4) whether it "unreasonably interferes with an employee's work performance; and (5) the effect on the employee's psychological well-being. Smith v. Family Enrichment Ctr., Inc., No. 8:08-cv-450-T-30TBM, 2009 U.S. Dist. LEXIS 43889 at *15 (M.D. Fla. May 26, 2009) (citing Harris, 510 U.S. 17, 23 (1993)).

An employer is strictly liable for sexual harassment committed by a supervisor only if the harassment culminates in a tangible employment action. Banks v. City of Atlanta, No. 21-14122, 2022 U.S. App. LEXIS 27394 at * 3 (11th Cir. 2022). If there is no tangible employment action, an employer can avoid liability by showing that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities. Id.at *3-4.

**1. Bocca's alleged conduct was not unwelcome.**

Nielsen cannot establish that Bocca's alleged conduct was unwelcome. She herself regularly participated in the allegedly hostile office culture by going on dating apps at work, telling co-workers about her sex life, and swearing in the office. (Pl. Dep. 246:18-247:1, 250:17-21, 333:5-24; 348:9-19; Helm Dep. 140:1-9; Vidic Dep. 31:25-12, 87:7-9). She also voluntarily chose to hang out with Bocca outside of the office *for years*, admitting she enjoyed getting along with him because it kept her in the "cool crowd" which made her life and job easier, and openly referring to Bocca as a person she loved "so much." (Pl. Dep. 125:6-18; 128:19-129:3; 132:14-133:1; 133:11-14; 136:22-137:5; 155:10--157:1; 255:8-19; 260:14-261:3). Nielsen had a friendly and jovial relationship such that others in the office were shocked by her allegations. (Vidic Dep. 81:7-82:3; Haddad Dep. 67:23-8). As such, her own conduct does not suggest that Bocca's conduct was unwelcome. See Murdoch v. Medjet Assistance, LLC, 294 F. Supp. 3d 1242, 1261 (N.D. Ala. 2018) (plaintiff's conduct showed a mutual welcomeness where she complimented him on his kindness as a boss). Furthermore, Nielsen's failure to report the alleged harassment for nearly *four years* while she was socializing and interacting positively with Bocca supports this conclusion. See, Coyle., 2009 U.S. Dist. LEXIS 148269 at *45 (discussing compilation of cases where delayed failure to report was considered in analysis of whether a plaintiff's conduct indicated that conduct was not unwelcome).

**2. Bocca's alleged conduct was not severe or pervasive.**

Bocca's alleged conduct was severe and pervasive. See generally, Smith v. Family Enrichment Ctr., Inc., No. 8:08-cv-450-T-30TBM, 2009 U.S. Dist. LEXIS 43889 at *15 (M.D. Fla. May 26, 2009) (setting forth the factors a court may consider when determining whether sexual harassment was severe and pervasive). Nielsen was employed for almost four years and was able to testify only to a handful of instances of conduct that occurred during that time, other than her generalized comments that Bocca told her she "looked hot" and "wanted to f**k her." (Pl. Dep. 7722-78:4, 79:6-10, 121:8-124:16). The only other instances that occurred in the office were when Bocca alleged told her she was "sitting perfect height" and when he allegedly tried to put Nielsen's hand on his penis.[13] (Id. 126:4-127:20).

Moreover, the alleged conduct was not severe when compared to the type of conduct that courts have found supports a claim for hostile work environment sexual harassment in this circuit. Cf., Lockett v. Choice Hotels, Inc'l Inc., 315 Fed. Appx. 862, 867-68 (11th Cir. 2009) (crude sexual remarks several times and week for four months and brief touching on two occasions not frequent); see also, Cusatis v. atl. Waste Servs., No. 4:22-cv-156, 2024 U.S. Dist. LEXIS 52837 at *29 (N.D. Ga.

[13] The other two instances of alleged conduct did not occur at work. (Id. 124:16-24, 157:20-5, 161:10-20).

March 25, 2024) (conduct consisting of touching and lewd comments, while inappropriate, did not meet the standard for severe or pervasive harassment).

Here, the workplace conduct Nielsen alleges does not rise to the level required to support her claim given the amount and type of conduct over the duration of time at issue and in light of Nielsen's continued, voluntary relationship with Bocca. Lastly, there is no evidence that Bocca's conduct unreasonably interfered with Nielsen's work performance, as she continued to get promoted throughout her tenure and deemed herself "magnificent" at her job.

### 3. There is no basis for CrossCountry to be held liable here.

Nielsen's delay in reporting the alleged sexual harassment was unreasonable as matter of law. CrossCountry had a sexual harassment policy in place, which included a provision advising employees that they could complain to the federal government, and Nielsen never attempted to use it because she was allegedly "afraid." However, absent a "credible threat of retaliation…subjective fears of reprisal do not excuse…the failure to report alleged harassment." Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1290-91 (11th Cir. 2003). Furthermore, fear of being fired and a view that reporting would be pointless are not "extenuating circumstances which would excuse an employee's failure to report. Swindle v. Jefferson Cnty. Comm'n, 593 F. App'x 919, 924-25 (11th Cir. 2014). Even if filing a sexual harassment complaint may be "uncomfortable, scary, or both," fear is not

an excuse for remaining silent. Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1307 (11th Cir. 2007).

Equally as important, Nielsen's refusal to cooperate in CrossCountry's investigation was inexcusable and she should not be rewarded for her refusal to tell CrossCountry about the conduct she now claims occurred. E.g., Harris v. Fulton-Dekalb Hosp. Auth., 255 F.Supp.2d 1347, 1357 (N.D. Ga. 2002) ("An employer does not buy a lawsuit when it attempts to comply with Title VII by investigating a claim of discrimination and dismissing an insubordinate employee who refuses to cooperate in the investigation"); see also Lattimore v. Initial Sec., Inc., No. 03-civ-7579, 2005 U.S. Dist. LEXIS 16162 at *10 ( S.D.N.Y. 2005) (refusal to cooperate with an internal investigation constitutes legitimate grounds for discharge); Jensen v. Nucor Corp., No. 1:21-cv-100, 2023 U.S. Dist. LEXIS 91352 at *38-39 (D. Utah May 23, 2023) (refusal to cooperate in an investigation justified summary judgment because refusal to cooperate demonstrates an unreasonable failure to take advantage of any preventative or corrective opportunities).

**B. CrossCountry is Entitled to Summary Judgment on Plaintiff's Title VII Retaliation Claim.**

Title VII prohibits employers from retaliating against employees from reporting or opposing discrimination. 42 U.S.C. § 2000e-3(a); see also EEOC v. Total Sys. Servs., 221 F.3d 1171, 1174 (11th Cir. 2000). If a plaintiff relies on

circumstantial evidence to prove retaliation, courts in this circuit apply the *McDonnell Douglass* burden shifting framework. Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020). Under that framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that she (1) engaged in a protected activity; (2) suffered a materially adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Id. From there, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action. Id. If the employer does so, the presumption of retaliation "drops from the case" and the burden shifts back to the plaintiff to show that the employer's reason "was not the real reason for the decision, but a pretext for discrimination. Id. (citations omitted). A plaintiff attempting to establish pretext must present *concrete evidence* showing that the proffered reasons were pretext for discrimination. See Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012).

**1. Nielsen did not suffer an adverse employment action.**

Here, Nielsen has not pleaded, nor can she prove, that she suffered an adverse employment action because she voluntarily resigned from her job. Porraz v. Kia Ga., Inc., No. 3:21-cv-00216, 2023 U.S. Dist. LEXIS 125314 at *53 (N.D. Ga. 2023) (confirming that voluntary resignation cannot support a claim for retaliation). Every person, including Nielsen herself via her text message to her friends on May 18,

2022, have established that Nielsen's resigned. (Pl. Dep. 174:4-20, 176:16-179:10; Matlin Dep. 93:11-17; 106:9-23; Haddad Dep. 105:11-16; Vidic Dep. 47:5-14; Scherma Dep. 71:15-24, 76:15-23, 109:21-24, 120:18-122:1; 124:18-22; 125:15-126:4, 126:9-25; Novak Dep. 69:13-70:1; 195:9-14). Her later efforts to spin her resignation into a "contemplated resignation" are self-serving and unavailing. Furthermore, the fact that CrossCountry gave Nielsen the opportunity to rethink her resignation and looked for remote opportunities for her, does not eviscerate her resignation or turn CrossCountry's acceptance into an adverse employment action.[14] Summary judgment is proper for this reason.

**2. CrossCountry's decision to accept Nielsen's resignation was legitimate and non-retaliatory and there is no evidence of pretext.**

Even if Nielsen could persuade this Court that an issue of fact exists as to whether she resigned on May 18, 2022, CrossCountry's decision to accept her resignation was legitimate and non-retaliatory. CrossCountry did not have a remote

[14] Notably, Nielsen has not pleaded a claim for constructive discharge. Nor could she since she keeps arguing that she that she actually did not quit. (Pl. Dep. 167:13-15). Regardless, there are no facts that would support such a claim as there is no evidence that either Bocca or CrossCountry made Nielsen's working conditions "so unbearable" that a reasonable person in her position would be compelled to resign. Flownory v. Femco, No. 1:23-cv-04058, 2024 U.S. Dist. LEXIS 111628 at *37 (N.D. Ga. 2024). "To plausibly plead constructive discharge, [Nielsen] must allege a *greater* severity or pervasiveness of harassment than the minimum required to plead a hostile working environment." Id. No facts support such a claim here in any event, especially where Nielsen stayed in the environment she claims was so hostile.

position for Nielsen and Nielsen was clear that she would never come back to Bocca's branch. (Pl. Dep. 178:25-179:6, 193:12-194:6). There is absolutely no evidence at all that CrossCountry's decision to accept Nielsen's resignation was aimed at punishing her for exercising her rights.

Furthermore, there is no evidence of pretext. Nielsen cannot prove "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in CrossCountry's proffered legitimate reasons for its actions such that a reasonable factfinder could find them unworthy of credence. Gogel v. Kia Motors Mfg. of Ga, 967 F.3d 1121, 1137 (11th Cir. 2020). This is important because courts are concerned with preventing discrimination and not sitting as super-personnel departments that reexamine a business entity's decisions or question how it handles its investigations and decisions. EEOC v. Jiudicy, Inc., No. 2:09-CV-163, 2012 U.S. Dist. LEXIS 192006 at *23-26 (N.D. Ga. 2012). Here, there is not one shred of evidence that CrossCountry's acceptance of Nielsen's resignation was motivated by discriminatory animus, especially where Nielsen herself refused to cooperate with the investigation. CrossCountry is entitled to summary judgment.

### C. CrossCountry is Entitled to Summary Judgment on Nielsen's State Law Tort Claims.

Nielsen's claims for negligent retention and supervision are derivative claims

that cannot survive summary judgment unless her underlying tort claims survive.[15] Stowers v. Protect Sec., LLC, No. 1:22-cv-4260, 2023 U.S. Dist. LEXIS 71941 at *22-23 (N.D. Ga. April 23, 2023). Because Nielsen's Title VII claims cannot support her state law claims for negligent retention and supervision, she can only pursue her claims for negligent retention and negligent supervision as they relate to her state law claims for civil assault and battery. See id. And to do that, Nielsen must establish that CrossCountry knew or should have known of Bocca's tendencies to engage in the behavior relevant to her alleged injuries, i.e., it must have known (or should have known) of any tendencies to engage in assault and battery. *Smith v. Outdoor Network Distrib.*, LLC, 626 F.Supp.3d 1320, 1347-48 (M.D. Ga. 2022).

With respect to civil assault, this means that the circumstances, reasonably viewed, are such that CrossCountry knew (or should have known) that Nielsen reasonably apprehended violence from Bocca. Stowers, 2023 U.S. Dist. LEXIS 71941 at *18-19 (explaining civil assault under Georgia law). With respect to civil battery, this means that the circumstances, reasonably viewed, are such that CrossCountry knew (or should have known) of Bocca's tendencies to engage in

[15] CrossCountry cannot be liable for Bocca's alleged sexual assault and battery, as such misconduct is purely personal and outside the scope of employment. E.g., Alpharetta First United Methodist Church v. Stewart, 221 Ga. App. 748, 752, 472 S.E.2d 532, 535 (1996); B.C.B. Co. v. Troutman, 200 Ga. App. 671, 672, 409 S.E.2d 218 (1991); Favors v. Alco Mfg. Co., 186 Ga. App. 480, 482, 367 S.E.2d 328 (1988).

unwanted touching. Bryant v. Norfolk S.R.R, No. 5:20-cv-00225, 2020 U.S. Dist. LEXIS 240439 at *19 (M.D. Ga. Dec. 22, 2020) (explaining civil battery under Georgia law).

At best, the record here shows that Bocca was accused of making lewd comments and Nielsen herself told Bocca repeatedly that she was not afraid of him. Thus, there is nothing to suggest that CrossCountry was on notice of any propensity by Bocca to engage in civil assault or battery or any fear on behalf of Nielsen. Cf., Alpharetta first United Methodist Church v. Stewart, 221 Ga. App. 748, 472 S.E.2d 532, 536 (Ga. App. 1996) (the plaintiff's evidence did not tend to show that the defendant knew or should have know that the employee had the propensity for the type of sexual misconduct alleged); Bunn-Penn v. S. Reg'l Medical Corp., 227 Ga. App. 291, 488 S.E.2d 747 (1997) (the evidence was not sufficient to put the defendant on notice that the employee had the propensity to commit the sexual assault alleged by the victim). This Court should grant CrossCountry summary judgment on Nielsen's negligent retention and negligent supervision claims.

**D. Nielsen is not entitled to front pay or back pay in the amount she seeks.**

There is no genuine issue of material fact that Nielsen is and remains underemployed. Because of this, back pay is not warranted. Servillo v. Sola Medi Spa, LLC, 2021 U.S. Dist. LEXIS 131467, *4 (M.D. Fl. July 13, 2021) ("[A]n award of back pay is intended to make the claimant whole, not to confer a windfall."); see

also, Ford Motor Co. v. EEOC, 458 U.S. 219, 231, 102 S. Ct. 3057 (1982). Front pay is also not warranted because Nielsen voluntarily took a lower paying job in an industry that is less stressful. Cf. Davis v. Integrated Sys. Solutions Corps., No. 97 C 3774, 2003 U.S. Dist. LEXIS 5092 at *9 (N.D. Ill. March 31, 2003).

By her own admission, Nielsen did not seek full-time, substantially equivalent employment and deliberately chose to become underemployed. (Pl. Dep. 23:17-24:13; 309:25-310:10). Accordingly, CrossCountry is entitled to a finding that there is no genuine issue of material fact on the issue of Nielsen's voluntary underemployment, which will impact any damages if this Court declines to grant CrossCountry's motion on all of Nielsen's claims.

**CONCLUSION**

Based on these well-established principles and the undisputed evidence, there remains no genuine issues of material fact for trial and summary judgment is therefore warranted on all of Nielsen's claims.

Respectfully submitted this 7th day of August, 2024.

**Lewis Brisbois Bisgaard & Smith LLP**

By: / Kerri L. Keller
John S. Snelling
Georgia Bar No. 665759
600 Peachtree Street, N.E., Suite 4700
Atlanta, GA 30308
(404) 567-6588 (telephone)
(404) 467-8845 (facsimile)
john.snelling@lewisbrisbois.com

John R. Conley, *Pro Hac Vice*
Ohio Bar No. 0084079
Kerri L. Keller, *Pro Hac Vice*
Ohio Bar No. 0075075
1 Gojo Plaza, Suite 400
Akron, OH 44311
(330) 272-0000 (telephone)
(330) 272-0019 (facsimile)
john.conley@lewisbrisbois.com
kerri.keller@lewisbrisbois.com

***Attorneys for Defendant CrossCountry Mortgage, LLC***

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that foregoing submission complies with the type-volume limitations set forth in Rule 5.1 of the Local Rules of the United States District Court for the Northern District of Georgia and has been prepared with double spaces between the lines and using Times New Roman 14 point font size.

/s/ Kerri L. Keller
Kerri L. Keller

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on this 7th day of August 2024, a copy of **DEFENDANT CROSSCOUNTRY MORTGAGE, LLC'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT** was served via the Court's ECF system to all counsel of record.

/s/ Kerri L. Keller
Kerri L. Keller