IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHRISTINA NIELSEN,

     Plaintiff,

v.

CROSSCOUNTRY MORTGAGE, LLC;
and STEVEN BOCCA,

     Defendants.

CIVIL ACTION NO.
1:23-cv-02353-MLB-RDC

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

This is an employment discrimination case. Plaintiff Christina Nielsen has sued her former employer, Defendant CrossCountry Mortgage, LLC ("CCM"), and her former supervisor, Defendant Steven Bocca. She asserts claims of sex discrimination and retaliation in violation of Title VII,[1] along with related state-law claims. Following discovery, Defendants both moved for summary judgment. (Docs. 89–90). For the reasons below, the undersigned **RECOMMENDS** that Defendants' motions be **DENIED**.

### I. BACKGROUND

Plaintiff spent four years working for CCM. She alleges that Bocca sexually harassed her throughout that period, that CCM negligently supervised and retained Bocca, and that CCM retaliated when she eventually complained. Defendants have contested

---

[1] 42 U.S.C. § 2000e, *et seq.*

elements of Plaintiff's testimony, but at this stage the evidence is construed in her favor.[2]

### A. Factual Background

CCM is a retail mortgage lender headquartered in Cleveland, Ohio. (Doc. 90-3 ["Novak Decl."] ¶ 2). It operates more than 1,200 branches around the country with over 7,000 employees. (*Id.*). In July 2018, CCM hired Plaintiff to work as a loan processor at its Alpharetta, Georgia branch. (DSMF ¶ 1). At all relevant times, the Alpharetta branch was managed by two individuals: Bocca (the originating branch manager) and his longtime girlfriend, Faith Helm (the non-originating branch manager). (PSMF ¶ 1; Doc. 91-1 ["Pl. Dep."] at 43–45; Doc. 91-4 ["Helm Dep."] at 11, 13, 19).[3] Bocca was one of CCM's top producing loan officers nationwide. (Doc. 92-5 ["Bocca Dep."] at 143–45).

Bocca's alleged misconduct is at the center of this case, but before turning to the relevant evidence we should set the table with some context: first, CCM's workplace policies; then, the Alpharetta branch's office culture.

---

[2] The relevant facts are taken mainly from the parties' statements of material facts, (Doc. 90-1 [Defendant CCM's Statement of Material Facts, "DSMF"]; Doc. 95 [Plaintiff's Corrected Statement of Additional Material Facts, "PSMF"]), together with other portions of the record as appropriate. Where the parties offer conflicting accounts, the undersigned draws all reasonable inferences and presents all evidence in the light most favorable to Plaintiff as the non-moving party. The undersigned notes that Plaintiff's opposition brief includes 48 footnotes, nearly double the number of pages. (Doc. 94). Many of those footnotes contain additional facts not otherwise included in Plaintiff's PSMF. That's a problem. The parties were specifically allotted 50 numbered facts to make their summary-judgment arguments, and the undersigned warned them that the Court would not consider any additional facts except with prior leave. (Doc. 87 at 2). Plaintiff neither sought nor received such leave. And her stratagem of smuggling additional facts in through footnotes plainly violates the undersigned's instruction. The undersigned has thus disregarded all of Plaintiff's purported facts except those included in her PSMF or as otherwise independently drawn from the record and deemed relevant.

[3] A note regarding deposition citations: except as otherwise indicated, this Report cites to the CM/ECF pagination rather than the transcript pagination.

2

### *i. CCM's Policies and the Alpharetta Branch Culture*

During Plaintiff's tenure, CCM published a written "Unlawful and Sexual Harassment Policy," which strictly prohibited sexual harassment—including, for example, sexual "jokes," "unwelcome remarks," and "unwelcome physical contact or touching." (DSMF ¶ 4; Novak Decl. at 5–14). This is what it said about reporting:

> It is recommended that the affected employee should ask the alleged harasser to stop, if comfortable doing so. Should the harassment continue even after you have asked the employee to stop the action, or if you do not feel comfortable confronting the harasser directly, you must report [the] conduct using one or more of the reporting avenues available: report it immediately to your immediate Manager, the Senior Vice President of Human Resources, and/or the Legal Department. . . . Employees do not need to follow any specific "chain of command" when making a report. Affected individuals may also direct complaints to the federal Equal Employment Opportunity Commission ("EEOC") . . . and any of the various state agencies identified in Appendix A.

(Novak Decl. at 6–7). The policy directed employees to report harassment whether they experienced misconduct themselves or witnessed it against others. (*Id.*). And the policy also expressly forbid retaliation. (*Id.*).

In addition, CCM adopted a written "Open-Door Policy," which encouraged "open communication between employees and all levels of management." (*Id.* at 25). There, CCM directed employees to "immediately" report any harassment. (*Id.*). Echoing the anti-harassment policy, this policy also provided the following: "While the appropriate line of communication is customarily to your manager, at times, employees may be concerned about a situation or a problem. If this is ever the case, we strongly suggest communicating these concerns to the Senior Vice President of Human Resources." (*Id.*).

Plaintiff electronically acknowledged receipt of both policies during the employee-

3

onboarding process.[4] (DSMF ¶¶ 6–7).

Turning to the Alpharetta branch culture, it was by all accounts closeknit and chummy. (*Id.* ¶¶ 8–9). One employee, for instance, described the workplace as a "family-like environment." (Doc. 91-2 ["Vidic Dep."] at 26). As already mentioned, the branch was managed by Bocca and Helm. Employees occasionally gathered, along with friends and industry colleagues, at Helm's house for after-hours and holiday parties. (Helm Dep. at 141–42; Vidic Dep. at 32). Although the get-togethers weren't mandatory, Helm sent out invitations using her work email. (PSMF ¶ 26; Helm Dep. at 141–42). And again, they were regularly attended by employees—including Bocca and Plaintiff. (DSMF ¶ 10; Helm Dep. at 140; Vidic Dep. at 32). Collegial as it was, however, the workplace was also sometimes coarse. "Four-letter words" were used "like commas," and Plaintiff herself admits that she cursed in the office. (DSMF ¶ 11; Pl. Dep. at 311; Vidic Dep. at 25). Juvenile humor was commonplace. (Pl. Dep. at 89–90; Bocca Dep. at 191; Helm Dep. at 137; Vidic Dep. at 26). But according to Plaintiff, Bocca and Helm (less so)—who joked about sexual matters— were the bawdiest. (Pl. Dep. at 89–90).

### ii. *Bocca's Alleged Misconduct*

Plaintiff alleges that Bocca first made sexual comments to her in October 2018, just

---

[4] According to Plaintiff, she "does not recall receiving a CCM employee handbook, did not think an employee handbook applied to her personally at CCM, and believed she was 'not protected.'" (Doc. 94 at 2). Regardless, uncontested evidence shows that she received the handbook. *See Demmons v. Fulton Cnty.*, No. 1:09-cv-2312-TWT-WEJ, 2010 WL 3418325, at *3 (N.D. Ga. Aug. 2, 2010) (rejecting the plaintiff's objection regarding receipt of her employer's sexual harassment policy during new-hire orientation because she failed to present evidence controverting that fact), *R. & R. adopted*, 2010 WL 3418328 (N.D. GA. Aug. 25, 2010).

a few months after she started with CCM. (DSMF ¶ 19; Pl. Dep. at 78–79). The misconduct later ramped up when she was transferred to Bocca's "team" in December 2020 and started working more closely with him. (Pl. Dep. at 109–10, 113–18). For instance, around this time, Plaintiff served as the designated driver for Bocca and Helm on the way back from an off-site holiday party, and as the pair was "making out" in the car Bocca asked Plaintiff to "come have a threesome." (PSMF ¶ 7). She declined. (*Id.*). But from then on, according to Plaintiff, Bocca made sexual comments to her "almost every day"—saying things like "you're so f'king hot" or "I want to f- you." (*Id.* ¶ 4).

Besides these persistent verbal incidents, Plaintiff testified that Bocca inappropriately touched her four times. The first time happened at the holiday party in December 2020, when Bocca "took [her] hand, and he placed it on his penis." (*Id.* ¶ 6). The other three episodes each occurred more than a year later, in 2022. As he had done previously, Bocca once again took Plaintiff's hand and "put it on his penis," this time at the office. (*Id.* ¶ 8). On another occasion, while Plaintiff was seated in a coworker's office, Bocca walked up to her, pushed the back of her head down toward his penis and said, "you're sitting perfect height." (*Id.* ¶ 9). Finally, at a birthday party at Helm's house in April 2022, Bocca asked Plaintiff to "make out" with him. (*Id.* ¶ 11). She refused, but afterward Bocca "grabbed [her] ass" when he walked behind her. (*Id.* ¶ 13).

Plaintiff testified that Bocca's conduct made her anxious and scared, and she worried that she might lose her job if she complained. (PSMF ¶¶ 5, 18; Pl. Dep. at 77, 103, 126). Based on conversations with other female employees, she also felt like she wasn't alone. (PSMF ¶ 15; Pl. Dep. at 81–84, 89–105, 129–32). Plaintiff believed Bocca was

sexually harassing other female employees, and even some female clients. (Pl. Dep. at 81–84, 89–105, 129–32). But she doesn't recall ever telling Bocca to stop, and for years she did not report his conduct. (*Id.* at 129, 135–37). As she saw it, branch management was not an option—Bocca was the offender, and Helm was his girlfriend. Although Plaintiff and Helm were close at one point, she did not feel comfortable reporting Bocca's conduct to her. (*Id.* at 103–04, 174, 220, 224, 228). As for HR, there was no local HR representative at the Alpharetta branch and, according to Plaintiff, rumor was that corporate HR wouldn't help. (*Id.* at 133–34).

### iii. Prior Reports of Harassment

Plaintiff eventually reported Bocca's alleged misconduct—a matter that will be addressed shortly—but there is evidence that, even beforehand, CCM knew other female employees had complained about Bocca's behavior.[5] In March 2019, for instance, Bocca himself notified CCM corporate management and HR after he learned that a former female employee, Lisa Benjamin, had hired an attorney and was planning to file a lawsuit alleging that he sexually harassed her. (PSMF ¶ 36; Doc. 92-1). Bocca denied any wrongdoing but alerted the company because, in his words, he "d[id] not want this to come as a surprise." (Doc. 92-1). CCM evidently didn't believe that Bocca's disclosure merited any responsive action. (PSMF ¶ 37). Benjamin filed an EEOC charge a month later, claiming that Bocca

---

[5] Plaintiff has presented evidence that rumors about Bocca's mistreatment of women circulated in the local mortgage industry *before* CCM even hired him. (Helm Dep. at 211). Even if knowledge about vague rumors could be imputed to CCM, however, there is better evidence that CCM actually knew about Bocca's alleged behavior *while employed* with the company. *See* Section III.A.i below. Because such evidence is more probative of CCM's knowledge, the undersigned finds the limited evidence of pre-employment rumors is extraneous at this stage.

"subjected [her] to sexual harassment." (Doc. 92-8 at 30). In the charge, Benjamin detailed

some of the inappropriate sexual comments that Bocca allegedly made at the office. (*Id.*).

In November 2020, another former female CCM employee, Aydee Short, filed a

counterclaim against the company alleging that Bocca sexually harassed her. (PSMF ¶ 39;

Doc. 90-12 at 12–17; Doc. 92-8 at 36–45). She too alleged, both in her counterclaim and

in an arbitration statement she later filed, that Bocca made inappropriate sexual remarks.

(Doc. 90-12 at 12–17; Doc. 92-8 at 36–45). And she attached affidavits to her arbitration

statement from two other former employees, including Benjamin, which detailed Bocca's

alleged misconduct. [6] (Doc. 92-8 at 48–49, 51–55). Both the Benjamin and Short

complaints were handled by CCM's legal department rather than its HR department.

(Novak Dep. at 98, 177, 218–21, 224, 285). Neither complaint was recorded in Bocca's

personnel file, CCM took no remedial or disciplinary action, and no HR representative ever

visited the Alpharetta branch. (PSMF ¶¶ 2, 41; Novak Dep. at 183, 218–19, 222–24; Bocca

Dep. at 132).

### iii. Plaintiff's Complaint and CCM's Response

On the morning of May 18, 2022, Plaintiff arranged to meet with several coworkers.

(DSMF ¶ 24). She told them that she was "looking to resign" because of the sexual

harassment she had experienced. (*Id.*; Pl. Dep. at 164–67, 176). One coworker then called

---

[6] CCM contends that evidence regarding prior harassment complaints made by former female CCM employees against Bocca is inadmissible hearsay. However, such evidence—at least insofar as it is discussed in this Report—has been presented to prove whether and when CCM had notice of the prior allegations about Bocca, not whether he in fact engaged in the alleged prior misconduct. The evidence is thus not hearsay at all. *See* Fed. R. Evid. 801(c) (defining hearsay to include statements offered "to prove the truth of the matter asserted in the statement[s]").

corporate HR, at which point Plaintiff spoke with Michelle Novak, CCM's Executive Vice President of Human Resources. (DSMF ¶ 25; Pl. Dep. at 169–70). Plaintiff told Novak that she was "leaving" because she didn't believe that women were protected at the office. (PSMF ¶ 19; Pl. Dep. at 170). And for the first time, she then elaborated on Bocca's alleged misconduct. (Pl. Dep. at 170–71). Aside from Lisa Benjamin's 2019 EEOC charge, this was the first complaint Novak heard about Bocca's behavior. (Novak Dep. at 118, 122, 126, 183, 218–19, 232, 234, 285–87).

As she was speaking with Plaintiff, Novak told her she would investigate the situation and asked Plaintiff if she would be interested in transferring to a remote-work position rather than resigning. (DSMF ¶¶ 28–29; PSMF ¶ 20). Plaintiff agreed to think it over, and Novak instructed her to stay at home—with pay—in the meantime. (DSMF ¶ 30; Novak Dep. at 214–15). In a text message to her coworkers later that night, Plaintiff was reticent about her "reason for quitting," and she told them that she had "no clue what [her] next steps" would be. (Doc. 92-9 at 2).

On May 20, 2022, just two days after speaking with Novak, Plaintiff sent a follow-up email because she hadn't heard anything about either the investigation or possible transfers. (DSMF ¶ 32; Doc. 92-7 at 7). She included in her email a list of other female employees (one current, several former) whom she believed had been sexually harassed by Bocca. (PSMF ¶ 21; Doc. 91-7 ["Scherma Dep."] at 128–30;[7] Doc. 92-7 at 7). She also

---

[7] Brittney Scherma, an HR representative and CCM's Rule 30(b)(6) witness, was deposed over two days. Her deposition transcript has been filed with the Court in two volumes: Doc. 91-6 and Doc. 91-7. This Report refers to the volumes collectively as "Scherma Dep.," and cites to the continuous transcript pagination rather than the CM/ECF pagination.

told Novak that she filed an EEOC charge, explaining that "it is clear that you don't plan to investigate."[8] (Doc. 92-7 at 7). Plaintiff added that she was "happy to continue [her] job," but would "not come back to the office of work with Steve Bocca or Faith (his lover)." (*Id.*). Novak responded the next day and said she had started the investigation. (*Id.* at 9).

On May 23, 2022, Plaintiff again emailed Novak and complained about Bocca's relationship with Helm, expressing doubt as to whether CCM was "taking [her] complaint seriously." (*Id.* at 19). In response, Brittney Scherma, an HR Generalist who assisted Novak, left a voicemail for Plaintiff. (*Id.*). Plaintiff didn't call back but instead emailed Scherma that day and said: "I am very upset, and I am not comfortable talking on the phone with you at this point. What has your investigation found." (DSMF ¶ 33; Doc. 92-7 at 31).

The day after, May 24, 2022, Novak responded to Plaintiff and assured her that the investigation was underway, but she explained that privacy considerations limited the information she could share. (Doc. 92-7 at 36). Novak also confirmed that Plaintiff was "not fired or terminated," and she asked Plaintiff how she "would like to proceed." (PSMF ¶ 24; Doc. 92-7 at 36). Later that day, Plaintiff reiterated by email that she did not want to resign; instead, she remained interested in possible remote positions. (PSMF ¶ 25; Doc. 92-7 at 46). She was also "happy to meet" with Novak and an EEOC investigator, or to answer written questions, but she did not "feel comfortable meeting with [Novak] alone." (DSMF ¶ 34; PSMF ¶ 25; Doc. 92-7 at 46). On May 25, 2022, Novak wrote that she would make herself available to meet with Plaintiff and the EEOC investigator, and she confirmed

---

[8] Plaintiff did in fact file an EEOC charge on May 20, 2022. (PSMF ¶ 23).

that she would look for work transfers. (Doc. 92-7 at 51).

Between May 24 and June 16, 2022, Novak and Scherma interviewed eight employees in response to Plaintiff's complaint, including Bocca, Helm, the coworkers to whom Plaintiff first disclosed her allegations on May 18, and the lone current employee whom Plaintiff had identified as a victim of Bocca's conduct.[9] *See* (DSMF ¶ 35; Doc. 92-7 at 122; 92-8 at 8 (Michael Matlin), 9 (Bocca), 10 (Helm), 11–12 (John Michael Vidic), 13–14 (Kelsey Lorenzoni), 15 (Ethan Wolfe), 16 (Chad Sotherden), 17–18 (John Ellis Haddad)). Novak asked Bocca just a few questions, and he denied Plaintiff's allegations. (Novak Dep. at 265–66; Bocca Dep. at 180–82; Doc. 92-8 at 9). Meanwhile, Helm denied witnessing any misconduct at CCM. (Helm Dep. at 151; Doc. 92-8 at 10). Both reiterated their accounts during discovery.[10] (Bocca Dep. at 18–19, 180–82; Helm Dep. at 38, 80, 151, 235). As for the remaining employees, only one—the current female employee identified by Plaintiff—told Novak that she had witnessed Bocca make inappropriate sexual remarks.[11] (Scherma Dep. at 212; Doc. 92-8 at 13–14). While the interviews were ongoing, Scherma confirmed that there were no remote positions available for Plaintiff. (DSMF ¶ 36; Doc. 92-7 at 90–91, 93–94).

---

[9] Novak did not attempt to interview the former female employees identified by Plaintiff. (PSMF ¶ 38).

[10] Helm testified that she knew about the Short and Benjamin complaints, and that she had also "heard that somebody felt that [Bocca] was inappropriate" at a prior workplace. (Helm Dep. at 155, 157, 211).

[11] Helm testified that the female employee, Kelsey Lorenzoni, was laid off in October 2022, about three months after Plaintiff's termination. (Helm Dep. at 174–75). According to Helm, the layoff decision was made by herself, Bocca, and the HR department, although she testified that she wasn't aware at the time that Lorenzoni had confirmed Bocca's inappropriate conduct. (*Id.* at 175).

On May 26, 2022, shortly after the HR investigation began, Plaintiff notified Novak that she hired an attorney. (Doc. 92-8 at 87). According to Novak, under company policy, after CCM learns that an employee has either filed an EEOC charge or retained counsel, any related investigation "immediately goes over to legal." (Novak Dep. at 42, 98, 177, 180). It is then up to the legal department to make disciplinary decisions and bring the matter to Novak's attention, as need be. (*Id.* at 180, 219). And that's kind of what happened here. (*Id.* at 96, 100). According to Novak, she had initially planned to circle back to Bocca and interview him a second time, but she didn't get the chance to do so or to interview Plaintiff because she turned the investigation "over to [CCM's] legal department." (PSMF ¶ 30; Novak Dep. at 100). Even so, as described in the preceding paragraph, Novak and Scherma continued interviewing other employees through mid-June 2022.

On June 16, 2022, Scherma prepared a draft report summarizing HR's findings. (Doc. 92-7 at 122–25). The report concluded as follows:

> After the investigation and speaking with employees within the branch, we can confirm that [Plaintiff] did in fact resign on her own will.
>
> The only evidence we found that supported inappropriate allegations, was when speaking with [a female coworker]. [The coworker] mentioned that there was an inappropriate act conducted by Steven Bocca to her on 04.20.22. He went to kiss her while at an offsite party and made a vulgar comment.
>
> Other than that allegation . . ., we were not able to find evidence that supported any inappropriate or misconduct behavior [sic] by Steven Bocca.

(*Id.* at 125). According to Scherma, the summary was never forwarded to CCM's legal department or included in Bocca's personnel file. (Scherma Dep. at 215, 219). After the matter was transferred to CCM's legal department, Bocca doesn't recall speaking with

anyone from the company again about Plaintiff's complaint, and he received no disciplinary action. (Bocca. Dep. at 160–63, 182, 195).

### iv. Plaintiff's Termination

On July 5, 2022, roughly seven weeks after she complained about Bocca's conduct, CCM informed her by letter that she was terminated. (DSMF ¶ 38; Novak Decl. at 57). The letter was signed by CCM's legal department, which explained the decision this way: "Through the investigation completed by CrossCountry, we discovered that on May 18, 2022, [Plaintiff] voluntarily resigned from her employment with CrossCountry." (Novak Decl. at 57). Novak documented the termination as "voluntary," but she did not participate in the decision herself and doesn't know why the decision was made. (DSMF ¶ 39; PSMF ¶¶ 46–47; Novak Dep. at 294–95). CCM paid Plaintiff through July 1, 2022, the effective date of her termination. (DSMF ¶ 40; Novak Decl. at 57).

### B. Procedural History

In May 2023, after exhausting her administrative remedies, Plaintiff commenced this action. (Doc. 1). She asserts four claims:

(1)   sexual harassment, in violation of Title VII (Count I);

(2)   retaliation, in violation of Title VII (Count II);

(3)   assault and battery, in violation of Georgia law (Count III); and

(4)   negligent retention and supervision, in violation of Georgia law (Count IV).

Counts I, II, and IV are made against CCM, while Count III is asserted against Bocca individually. Following discovery, Defendants each moved for summary judgment. The motions are ripe and ready for review.

12

## II. LEGAL STANDARD

A reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). If the non-moving party does not support an essential element of his case, summary judgment is appropriate. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000). Moreover, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is not enough to advance the case to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Genuine issues in dispute are those for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "In determining whether

13

genuine issues of material fact exist, [the reviewing court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Rice-Lamar*, 232 F.3d at 840 (citing *Anderson*, 477 U.S. at 255). When the record "taken as a whole" could not reasonably support a finding in the non-moving party's favor, however, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

CCM says that Plaintiff has failed to satisfy key elements of the three claims she has asserted against it—*i.e.*, sex discrimination (Count I), retaliation (Count II), and negligent supervision and retention (Count IV). The details of CCM's arguments will be discussed below. As for Bocca, he has not challenged the merits of Plaintiff's assault and battery claim (Count III). Instead, he makes a procedural plea—he urges the Court to decline supplemental jurisdiction over the state-law claim in the event that Plaintiff's federal Title VII claims are dismissed. Plaintiff disagrees across the board, insisting that evidence supports her claims. Having carefully reviewed the briefing and record, the undersigned agrees with Plaintiff—Defendants' motions should be denied.[12]

---

[12] The undersigned makes two observations about Plaintiff's opposition brief before proceeding. *First*, as the undersigned previously remarked, she abused her footnote privilege. A good rule of thumb is that footnotes shouldn't outnumber pages (or even come close) in a legal brief, but Plaintiff nearly doubled that count. What's more, the footnotes are bloated with extra facts, a point already addressed, *and* legal citations—some of which are string citations. The latter practice is strongly disfavored. *See Matter of Peter J. Schmitt Co., Inc.*, 154 B.R. 632, 635 (Bankr. D. Del. 1993) ("String cites are not helpful to the court. . . . The court does not analyze legal issues by counting the number of decisions in favor or opposed to a result."). *Second*, it appears to the casual eye that parts of Plaintiff's brief may not be truly double-spaced, despite our Local Rules requiring as much. *See* LR 5.1(C)(2), NDGa. The undersigned will not recommend sanctions based on these observations, but Plaintiff is advised to abide by the letter and spirit of the Court's procedural requirements.

### A. Title VII

Plaintiff has asserted both federal and state-law claims, with the former arising under Title VII. The discussion starts there. Plaintiff's Title VII discrimination claim is addressed first, followed by her retaliation claim. Finally, before turning to Plaintiff's state-law claims, the undersigned will address a question raised concerning the availability of back pay and front pay.

### i. Sex Discrimination – Hostile Work Environment (Count I)

Plaintiff first seeks to hold CCM liable for Bocca's alleged harassment. CCM's summary-judgment argument is twofold. It contends that Plaintiff has failed to show Bocca's conduct was actionable, and in any event, it purports to have established an affirmative defense to liability. The undersigned concludes that Plaintiff's claim should proceed.

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citations omitted). To establish a hostile-work-environment claim based on sexual harassment, a plaintiff must show that: (1) she belongs to a protected class; (2) she experienced *unwelcome harassment*; (3) the harassment was based on sex; (4) the harassment was *severe or pervasive*; and (5) there is a basis for *holding the employer responsible*. *See Furcron v. Mail Ctrs. Plus*, 843 F.3d 1295, 1304–05 (11th Cir. 2016) (emphasis added). The parties dispute the second, fourth, and fifth elements, each of which will be discussed in turn.

Starting with the second element of unwelcomeness, the "correct inquiry is whether [the plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, *not* whether her actual participation in [any sexual activity] was voluntary." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (emphasis added). Put another way, the alleged harassment "must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982); *see also Meritor*, 477 U.S. at 68 (explaining that "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII"). The Supreme Court has cautioned that the issue presents "difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor*, 477 U.S. at 68. As we'll see, that is the case here.

A reasonable jury could conclude that the alleged harassment at issue was unwelcome. CCM, however, argues the opposite. It contends that Plaintiff's own behavior shows that she playfully indulged in, rather than objected to, Bocca's behavior and the Alpharetta branch culture. For instance, CCM notes that Plaintiff regularly swore in the office, that she sometimes discussed her private sex life with Helm, that she attended parties at Helm's house, and that she once laughed with coworkers when they teased her because she didn't know what it meant to be "thirsty." *See* (DSMF ¶ 11; Pl. Dep. at 296). Plaintiff also sent texts demonstrating that she had a close and affectionate relationship with Helm and Bocca, and she admitted at her deposition that she told Bocca she loved him—a phrase that was apparently commonplace around the office. *See* (DSMF ¶¶ 12–15; Pl. Dep. at

16

301–02). This evidence is, to be sure, testament to the comradery and occasional crudeness that prevailed at the Alpharetta branch—a point that is undisputed. Contrary to CCM's urging, however, this evidence does not demonstrate that Plaintiff welcomed the alleged harassment. Which, to recap, included years of near-daily sexual comments with multiple instances of inappropriate touching.

Plaintiff may have liked her coworkers—including Helm and Bocca—and even clowned around a bit. But that does not mean, and the evidence does not establish, that she invited the alleged misconduct. Far from it. There is zero evidence that Plaintiff instigated, solicited, reciprocated, or otherwise welcomed any of Bocca's advances. On the contrary— for instance, she declined his invitation for a threesome, she refused to make out with him at a party, and she testified that she feared Bocca and didn't want to lose her job by complaining. From this, a jury could conclude that Plaintiff found Bocca's conduct undesirable and offensive.[13] *See Otu v. Papa John's USA, Inc.*, 400 F. Supp. 2d 1315, 1326 (N.D. Ga. 2005) (the plaintiff raised a jury question on the issue of unwelcomeness where he testified that he was offended by his supervisor's advances, told her to stop on one occasion, and did not want to reject the supervisor outright to protect his job); *Clark v. Alloy Wheel Repair Specialists, LLC*, No. 1:18-cv-04746-MLB-RDC, 2021 WL 10428795, at *8–9 (N.D. Ga. Aug. 30, 2021) (the plaintiff raised a jury question on the issue of

---

[13] Defendant says Plaintiff's reporting delay suggests she welcomed Bocca's behavior. (Doc. 90-2 at 16). That is just one factor in the analysis. Given the totality of the circumstances, a jury could find Bocca's conduct was unwelcome despite the reporting delay. *See Otu*, 400 F. Supp. 2d at 1326 (plaintiff raised a jury question on unwelcomeness even though he never complained about his supervisor's harassment because "failure to report is just one factor in determining whether the conduct was unwelcome in light of the totality of the circumstances").

unwelcomeness even where she admitted that she had a consensual relationship with her supervisor, who was her alleged harasser).

Next, as for the fourth element of Plaintiff's claim—severe or pervasive harassment—there are subjective and objective components. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012). The undersigned credits Plaintiff's statements that she herself perceived the alleged harassment to be severe and pervasive. The question on summary judgment, then, is whether a reasonable person could agree. *See id.* To answer that question, courts evaluate whether the offending conduct was (1) frequent; (2) severe; (3) physically threatening or humiliating; and (4) an unreasonable interference to the employee's work. *Id.* Importantly, these evaluative factors are guideposts, not requirements. In other words, "no single factor" is necessary to make out a hostile work environment. *Harris*, 510 U.S. at 23. The alleged misconduct must be considered in context and judged as a whole to see if the impression that emerges exceeds the level of abusiveness necessary to create a hostile work environment. *See Jones*, 683 F.3d at 1301–02.

Viewing the evidence this way and construing it in Plaintiff's favor, a reasonable jury could find that she experienced objectively severe and pervasive harassment. To begin with, the first factor lands in her favor. Bocca's alleged misconduct was frequent. According to Plaintiff, he would make comments like "you're so f'king hot" or "I want to f- you" almost every day. Next, although most of the alleged harassment was verbal, Bocca also inappropriately touched her on four occasions—he placed her hand on his penis twice,

18

pushed her head toward his penis once, and touched her butt.[14] These incidents were forceful, explicit, and humiliating. *See McDaniel v. Rotunda Land & Dev. Grp., LLC*, No. 1:20-cv-4672-SDG-JKL, 2023 WL 11967860, at *17 (N.D. Ga. Nov. 28, 2023) ("[E]very decision the undersigned has uncovered from this Circuit involving credible allegations of forcible genital contact have been found to meet the severity threshold of element four and the case has survived summary judgment." (collecting cases)), *R. & R. adopted*, 2024 WL 4648733 (N.D. Ga. Jan. 25, 2024). And at least once, a coworker was present. *See* (Pl. Dep. at 150); *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 779 (11th Cir. 2024) ("[H]arassment that occurs in the presence of coworkers is especially humiliating.").

There were also aggravating factors—Bocca was Plaintiff's supervisor, he worked closely with her every day, and he managed the entire Alpharetta branch with Helm, his girlfriend. *See Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character . . . ."). Finally, although Plaintiff had a stellar performance record, she testified that Bocca's behavior made her scared and anxious, and it eventually affected her mental

---

[14] Defendant points out that two of the alleged incidents of touching occurred outside of work. In the undersigned's view, although that fact might make a difference under other circumstances, it doesn't matter here. On Plaintiff's telling, the incidents occurred at work-related events—a holiday party and a party at Helm's house. Evidence shows that the events were attended by Alpharetta branch employees, that the event at Helm's house was organized by Helm, that Helm sent out invitations from her work email, and of course, Helm was Plaintiff's supervisor. Under the circumstances, it would be appropriate for a jury to consider these incidents as part of Plaintiff's claim. *See Gray v. Koch Foods*, 580 F. Supp. 3d 1087, 1110 n.11 (M.D. Ala. 2022) ("The Court is unconcerned by the fact that the garage incident occurred off-premises since [the harassing employees] allegedly persuaded [the plaintiff] to come to the house on the basis that they would be discussing work." (citing *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742, 748 (1998)).

state so much so that she could no longer work in-person at the Alpharetta branch office.[15] *See Harris*, 510 U.S. at 22 ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers"); *Olson v. Lowe's Home Ctrs., Inc.*, 130 F. App'x 380, 388 (11th Cir. 2005) (finding sufficient evidence that harassment interfered with the plaintiff's performance where she tried to avoid the harasser and was unable to work at her previous job level). Judging these circumstances as a whole, a reasonable jury could find Bocca's behavior was severe and pervasive.

The fifth and final element is the thorniest, but the undersigned concludes that CCM may be liable for Bocca's alleged misconduct. Hostile work environment claims come in different varieties. And significantly, an employer's liability—along with the underlying theory of liability and the manner by which such liability must be proven—hinges on the precise nature of the claim asserted. We thus start with a diagnostic inquiry—*i.e.*, by identifying the claim at issue here.

There are multiple important decision points along the way, starting with whether the alleged harasser was a coworker or supervisor. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (observing that "[u]nder Title VII, an employer's liability for [workplace] harassment may depend on the status of the harasser," and explaining that "different rules"

---

[15] To be clear, Plaintiff has not alleged constructive discharge. Nevertheless, she stated that she could no longer work with Bocca at the Alpharetta branch, and that itself attests to the impact his alleged misconduct had on her job performance. *See Olson*, 130 F. App'x at 388.

apply to coworker versus supervisor harassment). Here, everyone agrees that Bocca was Plaintiff's supervisor.

With that in mind, the next question is whether the plaintiff is pursuing direct or vicarious liability. *See Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 421 (11th Cir. 1999) (describing the "two grounds" on which an employer can be held liable for a supervisor's harassing conduct); *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 580–88 (11th Cir. 2007) (reviewing claims of direct and vicarious liability for a supervisor's alleged harassment). Plaintiff appears to be pursuing *both*. *See* (Doc. 1, Count I; Doc. 94 at 13 n.17). CCM, however, *only* challenges vicarious liability. *See* (Doc. 90-2 at 15, 18–19). That means Plaintiff's direct-liability theory is unopposed and should advance. *See Robinson v. RockTenn CP, LLC*, 986 F. Supp. 2d 1287, 1301 (N.D. Ala. 2013) ("As the moving party, it is the Defendant's burden to establish that there is 'no genuine issue of material fact' as to each claim asserted by Plaintiff. It is not the job of the court to search through the record and make arguments for the parties." (citation omitted)).

Anticipating objections, however, the undersigned will take a moment to explain why Plaintiff's hostile-work-environment claim predicated on direct liability would survive summary judgment, *even if* challenged. Here's the main difference between the two liability theories: a plaintiff must prove that her employer itself acted unlawfully to establish direct liability, whereas the plaintiff need only prove that a supervisor (rather than the employer itself) acted unlawfully to establish vicarious liability, although in the latter case the employer can avoid liability by proving an affirmative defense. *See Minix*, 237 F. App'x at 580–88. To simplify a bit and put it another way, to establish direct liability, the

21

plaintiff must prove her employer *was* negligent; by contrast, to avoid vicarious liability, the employer must prove that it *wasn't* negligent. In either case, then, the employer's notice of alleged harassment and the actions it took (or failed to take) to correct and prevent ongoing harassment are key. *See Dees*, 168 F.3d at 422 ("[I]n regard to both the direct liability standard and the employer's affirmative defense to vicarious liability, the employer's notice of the harassment is of paramount importance."); *Minix*, 237 F. App'x at 580 (observing that a plaintiff can *establish* direct liability by showing that the employer "knew or should have known about the conduct and failed to stop it") and at 584 (observing that an employer can *avoid* vicarious liability by showing that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior").

The following points will be elaborated more below but there is evidence CCM had actual notice, more than two years before Plaintiff filed her complaint, that Bocca may have harassed female employees. Yet there is very little evidence that it took responsive action to prevent future harassment. Thus, a jury could find that CCM itself is directly liable for Plaintiff's alleged injury. *See Dees*, 168 F.3d at 423 (holding that the employer could be directly and vicariously liable for workplace harassment because there was evidence it knew "supervisors were sexually harassing employees, yet failed to take any corrective action"). So much for direct liability.

Returning to Plaintiff's vicarious-liability theory, which CCM contests, there is one last question to answer: whether the alleged harassment culminated in a tangible employment action. *See Dees*, 168 F.3d at 422. There are two relevant employment actions here. Novak sent Plaintiff home on what was effectively administrative leave after she

complained in May 2022, and CCM later terminated her employment in July 2022. There is no evidence, however, that Bocca made or influenced either decision. Instead, uncontested evidence shows that Novak alone (and impromptu) made the first decision, while CCM's legal department—without having even interviewed Bocca about Plaintiff's complaint—made the second decision. The alleged harassment, therefore, did not include or culminate in a tangible employment action. *See Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 807 (11th Cir. 2006) ("To recover under the 'tangible employment action' theory of sexual harassment, the plaintiff must prove a causal link between the tangible employment action and the incident(s) of sexual harassment.").

That means CCM can be vicariously liable for—but only for—the alleged hostile work environment. *See Dees*, 168 F.3d at 422; *accord Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("Firing an employee because she will not cooperate with the employer's reasonable efforts to resolve her complaints is not discrimination based on sex, even if the complaints are about sex discrimination."). Here's the upshot of our inquiry: Plaintiff plausibly claims that CCM is vicariously liable because Bocca, her supervisor, created a sexually hostile workplace. That precise claim governs the remaining analysis.

Even under a theory of vicarious liability, an employer is not strictly liable for a supervisor's harassment. *See Baldwin*, 480 F.3d at 1303. The underlying idea is that a supervisor's misconduct is "made possible by abuse of his supervisory authority," and vicarious liability attaches to the employer under agency-law principles. *Faragher v. City of Boca Raton*, 524 U.S. 775, 802 (1998). But if no tangible employment action is taken—

as is the case here—the employer may escape liability by establishing the so-called *Faragher-Ellerth* affirmative defense.[16] *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001). The defense has two parts, and the employer has the burden of proving both. *Id.* The employer must demonstrate, first, that it exercised reasonable care to correct and prevent any harassing behavior, and second, that the plaintiff unreasonably failed to take advantage of opportunities to avoid the harm. *Id.* Evidence here shows that CCM fails at the gate, as it didn't act reasonably to prevent the alleged misconduct.[17]

Whether an employer acted reasonably is, like all questions of reasonableness, fact-intensive. The standard is floating, not fixed—what is reasonable in one case may not be reasonable in another. So, the inquiry must be calibrated to the circumstances. To illustrate, while an employer is not required to adopt a sexual-harassment policy, it will generally satisfy its burden as to the first element of the *Faragher-Ellerth* defense if it "promulgates a comprehensive anti-harassment policy." *Minix*, 237 F. App'x at 584. But that is not always the case. In other words, "an employer's showing that it has a sexual harassment policy does not automatically satisfy its burden." *Frederick*, 246 F.3d at 1314. Circumstances matter. For instance, even when an employer has a sexual-harassment policy, it will fail to meet its burden insofar as there are material questions as to the

---

[16] *See Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742.

[17] The parties have argued about the reasonableness of their respective actions *after* Plaintiff reported Bocca's alleged misconduct on May 18, 2022. Except as otherwise addressed in this Report, however, such actions are largely irrelevant. It is undisputed that the alleged harassment stopped after Plaintiff made her report. The discriminatory practice at issue (harassment) thus took place between October 2018, when it started, and May 2022, when it ended. Subsequent events may have some bearing on this case (as elsewhere discussed), but they are not central to CCM's affirmative defense. What matters most is what the parties did *before* the harassment stopped.

reasonableness of the employer's efforts. *See id.* at 1315. Likewise, notwithstanding any official policy, an employer can be vicariously liable if it knew that a supervisor was sexually harassing employees, "yet failed to take any corrective action." *Dees*, 168 F.3d at 423. Thus, if an employer learns about possible harassment, it cannot rest on its policy.

Evidence shows that CCM had actual notice of Bocca's alleged misconduct—in two ways. To start, actual notice may be imputed when an employee's supervisor witnesses the alleged harassment. *See Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1287 (11th Cir. 2018) ("The record thus contains evidence that Talton had actual notice of the hostile work environment despite Smelter's failure to report it. And because Talton was Smelter's supervisor, we can impute Talton's notice to Southern Home."). Plaintiff testified that she drove Bocca and Helm home after a holiday party in December 2020, and while the couple was making out in the backseat Bocca asked Plaintiff if she wanted to have a threesome. The couple then laughed about it. In other words, Helm—who co-supervised Plaintiff along with Bocca—witnessed Bocca's misconduct. Although Plaintiff's account is disputed it must be accepted for now. Putting Bocca himself to the side for a moment and crediting Plaintiff's testimony, evidence shows that Helm witnessed Bocca's misconduct. And importantly, under CCM's sexual-harassment policy, Helm was a designated reporting party—that is, she was among the class of persons to whom employees were directed to make harassment complaints. Under these circumstances, then, knowledge of Bocca's misconduct may be imputed to CCM. *See Smelter*, 904 F.3d at 1287; *Gray v. Koch Foods, Inc.*, 580 F. Supp. 3d 1087, 1115 (M.D. Ala. 2022) (concluding that the employer had actual notice of harassment because one supervisor "directly observed an employee being

harassed by another supervisor").

Even if Helm's first-hand observations were not enough to alert CCM to Bocca's alleged misconduct, however, several other notices clearly were. In March 2019, Bocca himself notified CCM's HR and legal departments—both of which, like Helm, were designated reporting parties under CCM's sexual-harassment policy—that a former female employee planned to file a harassment lawsuit. That same employee filed an EEOC charge weeks later, detailing Bocca's alleged misconduct. The following year, another former female employee sued CCM and Bocca, similarly alleging that he had sexually harassed her at the workplace. Given the foregoing information, how did CCM respond? Well, there is very little evidence of what it did. But here's what it did not do: it didn't send an HR representative to the Alpharetta branch, it didn't take any remedial action, and it didn't even memorialize the complaints in Bocca's personnel file. The question before the Court is whether CCM acted reasonably to correct and prevent workplace harassment at the Alpharetta branch. *See Frederick*, 246 F.3d at 1313. A reasonable jury might answer no. For that reason, CCM has failed to satisfy the first element of the *Faragher-Ellerth* affirmative defense.

Because CCM bears the burden of establishing both elements of its defense, failure in part is enough to push Plaintiff's harassment claim to a jury. That said, looking ahead to trial, the undersigned will pause briefly to address the second element. CCM says that Plaintiff unreasonably delayed in reporting Bocca's alleged misconduct. CCM is correct. The company's sexual harassment policy encouraged "immediate" reporting, and it expressly designated several reporting avenues—management (Bocca and Helm), the head

26

of the HR department (Novak), and/or the legal department. For obvious reasons, Plaintiff can be forgiven for not reporting Bocca to management. But there are "no extenuating circumstances" excusing Plaintiff's failure to explore other options for nearly four years. *See Baldwin*, 480 F.3d at 1307 (reporting delay of three months and two weeks was unreasonable); *Swindle v. Jefferson Cnty. Comm.*, 593 F. App'x 919, 924 (11th Cir. 2014) (reporting delay of two years was unreasonable). She testified that she waited so long because she feared Bocca and believed (based on rumor) that an HR report would be bootless. But those reasons do not excuse her delay. *See Swindle*, 593 F. App'x at 925–26 (observing that a plaintiff's "fear of being fired" and belief that reporting harassment "was pointless" did not excuse her failure to promptly report harassment). As the Eleventh Circuit has explained: "The genius of the *Faragher-Ellerth* plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches the severe or pervasive stage amounting to discrimination in violation of Title VII. . . . But that design works only if employees report harassment promptly, earlier instead of later, and the sooner the better." *Baldwin*, 480 F.3d at 1307. Here, Plaintiff simply "waited too long to complain." *Id.*

To wrap up, Plaintiff has presented enough evidence to advance her sexual harassment claim past summary judgment. A jury could conclude that Bocca's conduct was both unwelcome and severe and pervasive enough to create a hostile work environment. Moreover, CCM knew it might have a problem on its hands, and a jury could find that it didn't respond reasonably to address that problem. So, although the point went unchallenged, CCM may be directly liable for Plaintiff's injury. Meanwhile, CCM cannot

27

escape vicariously liability at this stage for essentially the same reason. CCM hasn't established that it acted reasonably to correct and prevent workplace harassment. The company knew that multiple former female employees had complained about Bocca's behavior, yet it appears that it took very little action in response. Although Plaintiff herself waited too long to report Bocca's conduct, a jury could nevertheless find that CCM is directly or vicariously liable.

### ii. Retaliation (Count II)

Next, Plaintiff claims that CCM retaliated when she complained about Bocca by immediately sending her home in May 2022 and then terminating her several weeks later in July 2022. CCM doesn't believe Plaintiff has met the requisite elements. The undersigned concludes that Plaintiff's claims should be trimmed but move forward.

Title VII prohibits retaliation against an employee who engages in statutorily protected activity. *See* 42 U.S.C. § 2000e-3(a). Retaliation claims are evaluated at the summary-judgment stage using either or both of two analytic techniques—the *McDonnell Douglas*[18] burden-shifting approach (specifically, a modified version thereof) and the so-called "convincing mosaic" approach. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337, 1342 (11th Cir. 2023). These approaches go by different names, and they are analytically distinct—*to a point*. Put another way, the approaches chart different courses though they ultimately arrive at the same place. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("[T]he *McDonnell Douglas* framework and the convincing

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

mosaic approach are two paths to the same destination—the ordinary summary judgment standard."). The court's charge in either case is to interrogate the evidence for disputed questions concerning unlawful animus. The first approach adopts a structured, sequential design that zooms in, while the latter takes a more fluid, holistic form and zooms out. In the end, however, the approaches merge. In other words, the "convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional [retaliation]." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023).

This discussion will start with the *McDonnell Douglas* burden-shifting approach but, as we'll see, it ends where the two techniques meet. To establish a *prima facie* case of retaliation, the plaintiff must present evidence that (1) she engaged in statutorily protected activity, (2) she suffered an adverse action, and (3) the adverse action was causally related to the protected activity. *Yelling*, 82 F.4th at 1337. If the plaintiff satisfies these initial elements but the employer articulates a legitimate reason for its action, then the plaintiff must show the employer acted pretextually. *Id.* In doing so, the plaintiff must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). That is, the plaintiff must prove that "had she not complained, she would not have been fired." *Yelling*, 82 F.4th at 1338 (citation omitted). Meanwhile, the convincing-mosaic framework skips this intervening sequence and jumps to the end, requiring only that the plaintiff "present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th

1300, 1311 (11th Cir. 2023).

CCM does not challenge Plaintiff's protected activity or the *prima facie* causal connection between her complaint and its resulting actions; instead, it focuses on the second *prima facie* element by arguing that Plaintiff suffered no adverse employment action. That is only partially correct. Plaintiff claims, to repeat, that CCM retaliated when it sent and paid her to stay home after complaining about Bocca in May 2022, and then again when it terminated her in July 2022. The former action doesn't qualify. Retaliatory conduct, whatever its form, is actionable so long as it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Yelling*, 82 F.4th at 1341 (citation omitted). Novak sent Plaintiff home after she complained about Bocca and said that she wouldn't work with him at the Alpharetta branch any longer. Plaintiff then stayed at home, with pay, for the next several weeks while CCM investigated her complaint and looked for alternative work options. Plaintiff's placement on what was effectively paid administrative leave under the circumstances was not, in the undersigned's estimation, a qualifying employment action. *See Goodson-Smith v. Fulton Cnty.*, No. 1:18-cv-5721-WMR-CCB, 2020 WL 13659440, at *10 (N.D. Ga. July 23, 2020) ("Courts have consistently held that being placed on administrative leave pending an internal investigation is not an adverse employment action that would dissuade a reasonable employee from making or supporting a discrimination charge."), *R. & R. adopted*, 2020 WL 13659439 (N.D. Ga. Sep. 21, 2020). The same cannot be said, obviously, about Plaintiff's ensuing termination.

According to CCM, however, it did not terminate Plaintiff—the company instead

maintains that she voluntarily resigned. A jury might disagree. CCM ended Plaintiff's employment, and that's ultimately what matters. To be sure, evidence shows Plaintiff communicated her intent to resign on May 18, 2022, both to her coworkers and to Novak. But the uncontested evidence *also* shows that Novak immediately talked her out of it, promising to investigate her complaint and look for alternative work options. Within days, Plaintiff stated in writing that she was rescinding any purported resignation pending Novak's efforts, and Novak confirmed that Plaintiff was "not fired or terminated." Novak then started an investigation and as promised, she also asked around to find other work opportunities for Plaintiff.

But CCM's legal department ultimately decided, about seven weeks after Plaintiff first spoke with Novak and despite the latter's intervening efforts, to accept Plaintiff's purported resignation. Regardless, as of July 1, 2022, CCM itself—*not Plaintiff*—made the decision to end her employment. Or at least a jury could find as much. And that constitutes an adverse action. *See Bennett v. Tarrant Cnty. Coll. Dist.*, No. 3:22-cv-0289, 2023 WL 6628783, at *4 (N.D. Tex. Oct. 10, 2023) ("An employer's refusal to accept an employee's attempt to rescind her resignation can amount to an adverse employment action under certain circumstances."); *Ferrando-Dehtiar v. Anesthesia Grp. of Albany, P.C.*, No. 1:20-cv-01373, 2024 WL 1345345, at *13 (N.D.N.Y. Mar. 29, 2024) (finding that the employer's refusal to accept the plaintiff's resignation rescission could constitute a retaliatory adverse action where the employer continued to employ her and took nearly three months to decide not to accept the rescission).

When CCM maintains that it merely accepted Plaintiff's resignation (and thereby

rejected her attempt to rescind the same), what the company is really saying is that it had a legitimate reason to act. That is a nice segue to the next step in the burden-shifting approach, where CCM's argument is better situated. To restate, according to CCM—specifically, the termination letter issued by its legal department—the company ended Plaintiff's employment because it found that she had resigned about seven weeks earlier. On its face, that is a non-retaliatory rationale. An employer may legitimately accept an employee's resignation. So CCM has satisfied its burden, and we move to the final *McDonnell Douglas* step, at which point we arrive at the analytic terminal of summary-judgment review, regardless of approach: has enough evidence been presented for a reasonable jury to infer intentional retaliation?

In the undersigned's estimation, on the evidence presented, there is an inference available that could support a finding in Plaintiff's favor. Before articulating that inference, here's the evidence:

- Bocca was one of CCM's top producing loan officers nationwide, and he was in a long-term relationship with Helm, his branch co-manager.

- CCM, through its legal department, received detailed complaints about Bocca's alleged harassment of female employees at the Alpharetta branch in 2019 and 2020. But the company didn't take any corrective action or record the complaints in Bocca's personnel file.

- Nobody from CCM's HR department ever visited the Alpharetta branch office.

- Plaintiff had an excellent performance record, but CCM ended her employment just seven weeks after she complained about Bocca.

- CCM's legal department, which evidently made the termination decision, explained that the company had decided to belatedly accept Plaintiff's purported resignation. But there is no evidence explaining

32

how or why it made that decision. The decision is a black box—there is no evidence that the legal department conducted its own investigation or discussed with Novak the results of the HR investigation. Moreover, the legal department's rationale is at odds with evidence showing that Novak talked Plaintiff out of resigning and subsequently took steps to maintain her employment.

- The lone female employee interviewed in connection with Plaintiff's complaint (aside from Helm), who confirmed to Novak that Bocca had acted inappropriately, was terminated three months after Plaintiff. Both Bocca and Helm participated in that termination decision. (Helm Dep. at 174–75).

There are enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the described evidence, *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (citation omitted), that a reasonable jury might reject CCM's explanation and instead reach the following conclusion: CCM didn't want to lose one of its top earners, so the company—principally through its legal department—quashed sexual-harassment complaints related to the Alpharetta branch, including Plaintiff's own.

Put differently, it would be reasonable to infer that CCM didn't terminate Plaintiff because she purported to resign in May 2022 (although that was a convenient pretext), but because she complained about one of the company's top producers. And had she not charged Bocca with harassment, she would not have been terminated. *See Yelling*, 82 F.4th at 1338. Other inferences are available, particularly if some of the factual disputes are resolved against Plaintiff. But the record could support that conclusion. The undersigned thus finds that Plaintiff has presented enough evidence to advance her retaliation claim.

### iii. Damages

Aside from the issue of liability, CCM contends that Plaintiff, who no longer works

in the mortgage industry, is voluntarily underemployed and therefore cannot recover back pay or front pay. The question is best left for trial.

Back pay and front pay are both available under Title VII. Back pay is expressly authorized, 42 U.S.C. § 2000e-5(g)(1), while front pay is implied under the statute, *see Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 853–54 (2001). A plaintiff is presumptively entitled to back pay. *Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999) ("Successful Title VII claimants . . . are presumptively entitled to back pay."). Front pay, however, is only available as an alternative to reinstatement. *U.S. EEOC v. W&O, Inc.*, 213 F.3d 600, 618–19 (11th Cir. 2000) ("In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay. . . . While we presume that reinstatement is the appropriate remedy in a wrongful discharge case, when extenuating circumstances warrant, a trial court may award a plaintiff front pay in lieu of reinstatement." (cleaned up)).

CCM seems to argue that Plaintiff cannot recover back pay or front pay because she has failed to mitigate damages by remaining underemployed. It is true that plaintiffs have a duty to mitigate under Title VII. *See* 42 U.S.C. § 2000e-5(g)(1) ("[A]mounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988) (noting that the "duty to mitigate damages" may limit the amount of front pay available); *accord Duvall v. Novant Health, Inc.*, 95 F.4th 778, 793 (4th Cir. 2024) ("In order to receive [back pay or front pay], however, the plaintiff must have mitigated [her] damages."). That said, failure to mitigate is an affirmative defense that must be proven

by the employer. *See Smith v. American Serv. Co. of Atlanta, Inc.*, 796 F.2d 1430, 1431 (11th Cir. 1986) ("The burden of proving lack of diligence is on the defendant once a Title VII plaintiff has established damages resulting from the discriminatory acts of the employer.").

Mitigation is an issue of fact that turns on the reasonableness of the plaintiff's efforts. *See Perry v. Schumacher Grp. of La.*, No. 2:13-cv-36, 2020 WL 6938391, at *4 (M.D. Fla. Nov. 25, 2020) (observing that the reasonableness of the plaintiff's mitigation efforts should be determined by the factfinder). And in some cases, taking a lesser paying job may satisfy a plaintiff's duty to mitigate. *See U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 148–49 (4th Cir. 2017) (concluding that a plaintiff may reasonably mitigate damages even by accepting a lower-paying job, and reiterating that "whether a worker acted reasonably in accepting particular employment is preeminently a question of fact").

CCM has not identified sufficient evidence to satisfy its affirmative burden and take back pay or front pay off the table. Plaintiff must prove liability and damages at trial, and CCM will then have an opportunity to show she failed to take reasonable mitigation efforts. But it hasn't made that showing at this point, so questions about back pay and front pay should be reserved.

### B. State Law claims

Turning next to Plaintiff's state-law claims, she asserts one such claim against each Defendant. She alleges that Bocca committed assault and battery when he touched her multiple times without consent, and that CCM negligently retained and supervised Bocca because it failed to properly respond after learning about his alleged misconduct. The

claims will be tackled in that order.

### i. Bocca – Assault and Battery (Count III)

As already mentioned, Bocca has not challenged the merits of Plaintiff's claim against him. He instead notes, correctly, that this Court should decline jurisdiction over any state-law claims in the event it decides to dismiss Plaintiff's federal Title VII claims. That is indeed standard practice. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) ("When all federal claims are dismissed before trial, a district court should typically dismiss the pendant state claims as well."). In short, then, Bocca wants to procedurally piggyback on CCM's substantive Title VII arguments. But the undersigned has rejected those arguments. The District Judge may of course disagree, but if the undersigned's recommendations are adopted, CCM will have to defend itself at trial. That means that Bocca must do likewise.

### ii. CCM – Negligent Retention and Supervision (Count IV)

Plaintiff's final claim is that CCM is liable for negligently retaining and supervising Bocca. CCM insists that it had no advance notice of Bocca's alleged misconduct. The evidence suggests otherwise.

Under Georgia law, an employer can be held liable if it negligently hires, retains, or supervises an employee and that employee subsequently harms the plaintiff. *See Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001); O.C.G.A. § 34-7-20 ("The employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency."). To establish such a claim, the plaintiff must prove the employer knew or should have known of the employee's tendencies to engage in

the conduct which caused the plaintiff's injury. *Farrell*, 178 F. Supp. 2d at 1300.

Employer negligence can encompass workplace sexual harassment. *See Travis Pruitt & Assocs., P.C. v. Hooper*, 277 Ga. App. 1, 5 (2005) ("A cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." (citation omitted)). As CCM points out, however, a negligence claim can only move forward if there is a viable, underlying tort claim.[19] *See MARTA v. Mosley*, 280 Ga. App. 486, 489 (2006) ("A claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent that the underlying substantive claims survive.").

Here, there is such an underlying claim. As just discussed above, Bocca has not opposed Plaintiff's substantive tort claim for assault and battery. Because that claim against Bocca is a live one, CCM may in turn be held liable insofar as it failed to exercise ordinary care in retaining or supervising Bocca and such failure caused Plaintiff's alleged harm. *See Travis Pruitt & Assocs., P.C.*, 277 Ga. App. at 5.

Largely for reasons already stated, the undersigned concludes that Plaintiff has presented enough evidence to raise a jury question on her negligence claim. The Court

---

[19] Notably, federal claims for sexual harassment and/or retaliation will generally not support a claim under Georgia law for negligent retention and supervision. *See Smith v. Outdoor Network Distrib., LLC*, 626 F. Supp. 3d 1320, 1348 (M.D. Ga. 2022) ("District courts in the Eleventh Circuit have consistently held that "federal claims for employment discrimination or retaliation will generally not support a claim under Georgia law for negligent supervision and retention." (citation omitted)).

must credit Plaintiff's testimony for now, and in doing so, the undersigned thus assumes that Bocca did in fact commit the alleged acts toward Plaintiff as described in this Report. Moreover, there is uncontroverted evidence that CCM knew about Bocca's alleged sexual harassment no later than March 2019 when he self-reported allegations against him.

A reasonable jury could find that the company didn't exercise ordinary care in response to such knowledge, and that its failure led to Plaintiff's ensuing injury. *See MARTA*, 280 Ga. App. at 490 (jury question raised regarding the sufficiency of the employer's response where evidence showed that it had notice of a supervisor's alleged harassment); *BCB Co. v. Troutman*, 200 Ga. App. 671, 673 (1991) (jury question raised regarding the employer's response where evidence showed that it had notice of a supervisor's alleged harassment based on information provided by multiple employees). Therefore, this claim, like the others, should be presented to a jury.

## IV. CONCLUSION

For the reasons stated, the undersigned **RECOMMENDS** that Defendants' motions for summary judgment, (Docs. 89–90), be **DENIED**.

IT IS SO **RECOMMENDED** on this 18th day of December 2024.

_____

REGINA D. CANNON
United States Magistrate Judge